# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### MONROE DIVISION

| | | |
|---|---|---|
| NICHOLAS T. STRINGFELLOW AND JULIAN TELLIS | * | CIVIL ACTION NO.  16-0756 |
| VERSUS | * | MAG. JUDGE KAREN L. HAYES |
| CITY OF RUSTON, ET AL. | * | |

## MEMORANDUM RULING

Pending before the court are two motions filed by defendants City of Ruston, Officer Jason Burnham, Officer Slade Darden, Officer Tyler Davidson, and Chief Steve Rogers: 1) motion for summary judgment [doc. # 49]; and 2) motion to compel discovery responses, plus associated request for fees, [doc. # 28].  For reasons assigned below, the motion for summary judgment is GRANTED, and the motion to compel is DENIED, as moot.[1]

## Background

On the evening of May 31, 2015, Jyone Cottingham, a black female, was standing in line to purchase groceries at the Ruston Wal-Mart store, when she was accosted by three black males (later identified as Tyler Ward, Nicholas Stringfellow, and Julian Tellis).  After asking the males to cease and desist – without success – Cottingham called the police.

City of Ruston police officers, Slade Darden, Jason Burnham, and Tyler Davidson (all white males) were dispatched to the call, and quickly arrived on scene.  The officers proceeded to register 6 where they encountered Ms. Cottingham and one of the three men, Nicholas

---

[1]  With the consent of all parties, the District Court referred this matter to the undersigned magistrate judge for the conduct of all further proceedings and the entry of judgment.  28 U.S.C. § 636(c).

Stringfellow, who was standing in line behind her.  Julian Tellis briefly had left to use the restroom, but returned while the officers were engaged with Cottingham and Stringfellow.[2]

After listening to Cottingham and Stringfellow's versions of the encounter, the officers separated Stringfellow and Tellis from Ms. Cottingham.  As the officers attempted to obtain identity information from the men, both Stringfellow and Tellis informed the officers that they were not following proper procedures and stepped towards the officers.  This prompted the officers to handcuff Stringfellow.  Meanwhile, one of the officers grabbed Tellis to escort him outside.  However, Tellis became rigid and would not move, thereby prompting the officer to take Tellis to the ground to handcuff him.

The officers transported Stringfellow and Tellis to the detention center where the men were booked on various charges.  The men bonded out later that morning.  On July 7, 2015, the City of Ruston filed bills of information against Stringfellow and Tellis on charges of resisting an officer (violence) in violation of Ruston Ordinance 11:108B(1)(b).  On January 21, 2016, the prosecutor dismissed the charge against Stringfellow and "nolle prossed" the charge against Tellis.

On May 31, 2016, Stringfellow and Tellis filed the instant civil rights complaint under 42 U.S.C. § 1983 against the City of Ruston, Chief Steve Rogers, and Officers Jason Burnham, Slade Darden, and Tyler Davidson.  Plaintiffs alleged violations of their rights under the 4th, 5th, 6th, 9th, and 14th amendments to the U.S. Constitution.  They also asserted a state law tort claim and claims for violation of  rights under Article I, Sections 2, 3, 4, and 13 of the Louisiana

---

[2]  As it turns out, the principal harasser, Tyler Ward, exited the store before the police arrived.

Constitution.

As a result of the incident, Tellis alleged that he suffered abrasions to his wrists, and had to undergo hernia repair surgery. Moreover, both Stringfellow and Tellis's photographs were placed on the front page of the local newspaper. Stringfellow also had to defer military enlistment. Plaintiffs seek compensatory damages for mental distress, loss of liberty, invasion of privacy, pain and suffering, loss of earning capacity, loss of enjoyment of life, embarrassment, and humiliation. They also seek punitive damages against the officers, plus an award of attorney's fees and costs.

On April 3, 2017, all defendants joined in the instant motion for summary judgment seeking dismissal of plaintiffs' claims in their entirety. Plaintiffs filed an opposition brief on May 5; defendants filed a reply on June, 2, 2017. Thus, the matter is ripe.

## Summary Judgment Standard

Summary judgment is appropriate when the evidence before the court shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting *Anderson*, 477 U.S. at 247). "The moving party may meet its burden to demonstrate the absence of a genuine issue of material fact by pointing out that the record contains no support for the non-moving party's claim." *Stahl v. Novartis Pharm. Corp.*, 283 F.3d 254, 263 (5th Cir. 2002). Thereafter, if the non-movant is unable to identify anything in the record to support its claim, summary judgment is appropriate. *Id.*

In evaluating the evidence tendered by the parties, the court must accept the evidence of the non-movant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. While courts will "resolve factual controversies in favor of the non-moving party," an actual controversy exists only "when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air. Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). There can be no genuine dispute as to a material fact when a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322-323. The non-moving party may not rely merely on the allegations and conclusions contained within the pleadings; rather, the non-movant "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial." *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996). The non-movant does not satisfy his burden merely by demonstrating some metaphysical doubt as to the material facts, by setting forth conclusory allegations and unsubstantiated assertions, or by presenting but a scintilla of evidence. *Little*, 37 F.3d at 1075 (citations omitted).

Moreover, "summary judgment is appropriate in *any* case 'where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the

4

nonmovant.'" *Little, supra* (citation omitted) (emphasis in original).  In sum, "[a]fter the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000) (citation omitted).

### Relevant Facts

On May 31, 2015, at approximately 11:40 p.m., Jyone Cottingham was standing in line to purchase groceries at the Ruston Wal-Mart store, when she was accosted by Tyler Ward, Nicholas Stringfellow, and Julian Tellis.  (Deposition of J. Cottingham, pgs. 7-12; Pl. Opp. Exh. 10).  According to Cottingham, the three men were loud, disrespectful, and saying sexual things to her.  *Id*.[3]  Cottingham asked the men several times to leave her alone, but to no avail.  *Id*.  As a lone female at a store, late at night, Cottingham feared for her safety.  *Id*.  She warned the men that she intended to call the police.  *Id*., at pgs. 50-51.  However, the individual who later walked outside (Tyler Ward), replied "we don't care . . . the police can't do nothing to us."  *Id*.  Accordingly, after enduring the unwanted attention for approximately three to four minutes, Cottingham called 9-1-1 for her protection.  *Id*., at pgs. 9-12, 50.

The transcript from Cottingham's 9-1-1 call reflects that the conversation occurred at 11:46:45 p.m. on May 31, 2015, and went as follows,

**Dispatcher:**    9-1-1.

**Cottingham:**    Yes ma'am.  I have . . . uh . . three black males that are acting ignorant in
                             Wal-Mart.  And, I'm trying to . . . uh check out.  And they are being very

---

[3]  Cottingham testified at her deposition that the men were recording something on their phones.  *Id*., pgs. 14-16.  They were saying such things as "oh dang, she's fine . . . she fine . . . pretty little something something."  *Id*.  They also discussed the shape of her posterior.  *Id*.  The individual that had "dreads" (Tellis) nodded in agreement as the comments were made.  *Id*.

disrespectful.  And, I . . . I need somebody up here.

**Dispatcher:**    How are . . . how are they being disrespectful?

**Cottingham:**    They are just saying sexual things, and I'm trying to check out.

**Dispatcher:**    Do you know them?

**Cottingham:**    No, I do not.  And, I asked them to not to talk to me, and to leave me alone.

**Dispatcher:**    Okay.  Where are you at the store?

**Cottingham:**    Uh . . . Aisle Number 6.

**Dispatcher:**    Checking out?

**Cottingham:**    Yes ma'am.

(9-1-1 Transcript; Pl. Opp., Exh. 1) (in pertinent part).

City of Ruston police officers, Slade Darden, Jason Burnham, and Tyler Davidson were dispatched to the scene.[4]  According to all three officers, they were advised by dispatch that a woman at Wal-Mart had called in a complaint of three males harassing her.  (Darden Depo., pgs. 21-22; Burnham Depo., pgs. 53-54; Davidson Depo., pg. 11).  The officers quickly arrived on

---

[4]  Slade Darden worked for the Ruston Police Department from 2014 until September 2015.  (Darden Deposition, pgs. 11-12; Pl. Opp., Exh. 4-1).  Prior to that, he was employed as a deputy for one and one-half years with the Union Parish Sheriff.  *Id*.  He attended the police academy in 2013, and S.W.A.T. school training.  *Id*.  As of January 2017 (the date of his deposition), he had not worked in law enforcement since September 2015.  *Id*., pg. 71.  He planned to obtain employment overseas once this case is resolved.  *Id*., pgs. 71-73.
Jason Burnham worked for the Ruston Police Department from March 2009 until January 2017.  (Burnham Deposition, pgs. 7-8; Pl. Opp., Exh. 5-1).  Prior to that, he worked for the Louisiana Tech University Police Department for three years.  *Id*.  In January 2017, he was hired as a deputy with the Ouachita Parish Sheriff.  *Id*.
Tyler Davidson began his law enforcement career with the Ruston Police Department in November 2014.  (Davidson Deposition, pgs. 8-10; Pl. Opp., Exh. 9).  He attended basic police academy for approximately four months.  *Id*.  On May 31, 2015, he was in the field officer training program, assigned to Officer Burnham.  *Id*.

scene, entered Wal-Mart at the east-side entrance and encountered Cottingham at one of the

registers.  (Davidson Depo., pg. 23; Burnham Depo., pg. 12; Davidson Depo., pgs. 13-14).

The sequence of events that transpired at the Wal-Mart store (and outside) is compiled

from the following:

1)    a police motor vehicle recorder ("MVR") in Officer Burnham/Davidson's squad car with forward and rear facing cameras and audio from a microphone attached to Officer Davidson or Burnham, Def. Exh. C;

2)    Wal-Mart Video 1 (depicting the entrance from inside both sets of front doors), Def. Exh. D-1;

3)    Wal-Mart Video 2 (depicting the Wal-Mart foyer in between the outer and inner doors), Def. Exh. D-2;

4)    Wal-Mart Video 3 (an overhead camera looking down at register 6), Def. Exh. D-3;

5)    Wal-Mart Video with MVR Audio Overlay, Def. Exh. E;

6)    Shondra Fobbs Cell Phone Video; Pl. Exh. 3;[5] and

7)    Other written evidence submitted by the parties, as noted in the chronology below.[6]

---

[5]  The Fobbs video was a cell phone video capture by Fobbs of someone else's phone video depicting the officer(s) already on the ground with Tellis.  *See* discussion, *infra*. Defendants objected to the evidence because plaintiffs failed to timely submit it and because it constitutes hearsay, speculation, and conjecture.  (Defs.' Reply Memo., pgs. 8-9).

Defendants' objection is overruled.  Defendants were not materially prejudiced by the late submission of the video.  They were aware of it, and extensively questioned Ms. Fobbs about the video at her January 17, 2017, deposition.  *See* Fobbs Deposition; Pl. Opp., Exh. 12.  Moreover, the court only considered the recording for what is depicted visually, not for anything uttered by an unknown third person.

[6]  In support of their motion for summary judgment, defendants submitted affidavits from Officers Darden and Burnham.  (Def. MSJ, Exhs. H & I).  Plaintiffs urged the court to strike and disregard the affidavits because they are self-serving and contrary to the evidence.  (Pl. Opp. Memo., pg. 13).  In connection with their opposition brief, plaintiffs submitted the deposition transcripts for all three officers.  (Pl. Opp., Exhs. 4-1, 5-1, & 9).

**MVR Time**
**Stamp**

23:48:22      [Officers, Jason Burnham, Slade Darden and Tyler Davidson, arrived at the Wal-Mart parking lot.]

23:48:47      [Officers Jason Burnham, Slade Darden and Tyler Davidson exited their vehicles and walked into Wal-Mart.  They proceeded to cash register 6.]

23:49:24      (The officers approached Jyone Cottingham)

               **Cottingham**:  "How ya'll doing?"

               **Officers**:    "Alright, how're you ma'am?"

23:49:36      **Cottingham**:  "Two of them walked away."[7]

23:49:42      **Cottingham**:  they were saying, "*oh baby, can you please take me home.*"

23:49:50      **Officer**:    [to Stringfellow] "How're you doing man?"

23:49:50      **Stringfellow**:  "I really don't understand."

23:49:52      **Officer**:    "What were you doing?"

23:49:55      **Stringfellow**:  "I wasn't doing anything."

23:50:00      **Stringfellow**:  "Me and my homeboys were here to get . . . food."

23:50:06      **Stringfellow**:  "I said she was beautiful.  She was like . . . *don't talk to me . . . Oh okay, I understand. You don't want to talk no more . . .* "

23:50:18      **Stringfellow**:  "We weren't saying nothing to her. Ask her what we said to her that was out of hand . . ."

---

A party cannot rely on an affidavit that impeaches, without explanation, prior sworn testimony.  *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir.1996) (citations omitted).  Here, however, it is not apparent hat Darden and Burnham's affidavits are inconsistent with their deposition testimony.  Nevertheless, the court will rely on, and cite to the officers' depositions in lieu of their affidavits.

[7] Prior to the officers' arrival, Ward left the store, and Tellis went to the restroom.  *See* Cottingham Depo., pgs. 17-18.

8

23:50:24        **Cottingham**:   "Y'all were very [inaudible]."

23:50:26        **Officer**:       "Excuse me ma'am what did he say . . .?"

[Julian Tellis returns from the restroom around this time.]

23:50:30        **Cottingham**:   "*Hey . . . how're you doing* . . . I had the same thing today
                                   [inaudible]."

[The Wal-Mart overhead camera for register 6 reveals at least one of the officers resting his
hands on his belt.]

23:50:38        **Officer**:       [inaudible]

23:50:41        **Darden**:        [to Tellis] beckoning him to come to him.

23:50:43        **Tellis**:        "Who, me?"

23:50:44        **Officer**:       "Yes, you."

23:50:45        **Officer**:       "Come here!"

23:50:50        **Officer**:       "You too . . . come here!"

23:50:52        **Officer**:       "Okay . . . come here!"

23:50:58        **Officer**:       "Okay, come here."  (in a softer tone).

[Tellis and Stringfellow slowly walked towards the officers.]

23:51:01        **Officer**:       "How much you had to drink tonight?"[8]

23:51:03        **Tellis**:        "I ain't had none."

3:51:04         **Darden**:        "Step over here.  I'm not playing with ya'll.  Step over here.  Come
                                   on."

_____

    [8]  At his deposition, Darden stated that he smelled alcohol as soon as he made initial
contact with Stringfellow and Tellis.  *See* Darden Depo., pgs. 52-53; Pl. Opp., Exh. 4-1.  He also
observed them walk with unsure balance from the cash register to the front of the store.  *Id*., pgs.
55-57.

9

| 23:51:11 | **Officer**: | "Well, walk a little faster.  Let's go." |

| 23:51:15 | **Tellis**: | "I can't walk any faster." |

| 23:51:18 | **Darden**: | "People don't come to Wal-Mart to be harassed by ya'll.  People come in here to shop." |

[Stringfellow and Officer Darden are facing one other and standing inside both sets of doors at the Wal-Mart store's east entrance.]

| 23:51:28 | | Stringfellow told the officers that he did not harass her. |

| 23:51:29 | **Officer**: | "You said [sic] there and you said you said something to her." |

| 23:51:33 | | Stringfellow told the officer that he told her that she was "very beautiful." |

[Burnham walks into camera view and is standing facing Stringfellow and Darden.]

| 23:51:35 | **Officer**: | "How old are you?" |

| 23:51:36 | **Stringfellow**: | "I'm 20 years old." |

| 23:51:39 | **Darden**: | "This is what you're NOT old enough to do." |

| 23:51:47 | **Stringfellow**: | "I didn't harass her.  I said, 'you're very beautiful.'  She said, *don't talk to me; don't talk to me.*  Okay ma'am, okay, I understand." . . . That was it.  That was it." |

[Tellis walked into camera view, with Officer Davidson behind him.]

| 23:51:59 | **Burnham**: | [to Tellis] "How old are you?" |

| 23:52:01 | | Stringfellow told the officer that he was not bothering anybody. |

| 23:52:02 | **Darden**: | "How old are you?! . . . You got I.D.?" |

| 23:52:19 | **Darden**: | "Tyler, will you get his name?" |

| 23:52:23 | **Davidson**: | "What's your name?" |

| 23:52:26 | **Stringfellow**: | "Nicholas Stringfellow" |

| 23:52:37 | **Darden**: | [talking to Tellis] "You're getting on my nerves.  When I ask you |

your name, or ask you a question, you answer it. You don't look all around and ignore me. We got called here because ya'll were bothering somebody. So when I ask you something, you answer it."

23:52:40      Tellis told Officer Darden that he was supposed to ask him for his birthday.

23:52:46      **Darden**:          "Don't tell me how to do my job!"

23:52:49      **Stringfellow**:    "Hey, we can step outside, sir. You gotta do all this, we can step outside."

23:53:52      **Tellis**:          "I don't want to step outside."

23:52:54      **Davidson**:        [to Stringfellow] "When is your birth date?"

23:52:55      **Stringfellow**:    "January ___."

23:52:57      **Davidson**:        "What year?"

23:52:59      **Stringfellow**:    "19___."

[During this time, Tellis is talking to Darden and Burnham, but it is inaudible.]

23:53:01      **Officer**:         "You don't know our procedures."

23:53:02      **Tellis**:          "I actually do."

23:53:02      **2 Officers**:      [to Tellis] "No you don't."

23:53:05      **Stringfellow**:    "We actually do." [leaning his head forward for emphasis]

The party of five are standing facing inward, as follows:



◯ = Darden
▢ = Stringfellow
‡ = Tellis
● = Davidson
© = Burnham

11

23:53:07    **Stringfellow**:  "We actually DO."

[Stringfellow took a single, long step towards the officers, while Tellis contemporaneously took a small step forward.  Stringfellow stepped inside Davidson and came close to Burnham.]

At that point, they looked like this:



23:53:08    **Officer**:    "Turn around; turn around."

[Officer Burnham placed Stringfellow in handcuffs without incident  Meanwhile, Officer Darden reached forward and grabbed Tellis's left arm, which caused Tellis's right shoulder to swing around and make contact with Darden.]

[Darden briefly tried to escort Tellis toward the exit, but Tellis immediately stopped moving and became rigid.  (Stringfellow Deposition, pgs. 114-117; MSJ, Exh. N; Tellis Deposition, pgs. 110-111 ).[9]  In a purposeful move, Darden then pushed/pulled Tellis backwards across Darden's outstretched leg, thereby causing Tellis to lose his balance and fall to the ground with Darden landing on top on him.]

23:53:14    **Burnham**:    [to Davidson] "Help him."

23:53:15    **Darden**:    "Put them behind your back . . . Now!"

[While on the ground, Tellis squirmed and moved his limbs about.  *See* Fobbs Depo., pgs. 97-98, 110-111; Pl. Opp., Exh. 12.  Davidson assisted Darden with immobilizing Tellis so Darden could handcuff him.  In so doing, Darden placed his knee on Tellis' back.  Once Darden secured Tellis with handcuffs, he roughly jerked him to his feet.]

23:53:31    **Stringfellow**:  "What was that?  Where did that come from?"

23:53:36    **Officer**:    "Get up"

23:53:37    **Stringfellow**:  "What procedure was that?"

23:53:40    **Stringfellow**:  "Tell me what procedure was that?"

---

[9]  Darden explained that he had Tellis in an "escort position," which is a technique taught at the police department.  (Darden Depo., pg. 67).  The technique entails grabbing the suspect by the back of his arm and walking him out.  *Id*.

23:53:43    **Stringfellow**:  "Sir, that's some money and a phone. [apparently referring to objects in his pocket.]  Tell me, what procedure was that?"

[The officers quickly walked Stringfellow and Tellis to the squad cars parked outside. Stringfellow and Tellis appeared to be walking at a slower pace than the officers, thus prompting the officers to push them along from behind].

23:53:48    **Officer**:      "Come here."

23:53:49    **Stringfellow**:  "What procedure was that?"

[The officers and Stringfellow briefly appeared behind the police unit on its rear-facing camera.]

23:53:59    **Stringfellow**:  "Sir, what did I do?"

23:54:00    **Burnham**:     [to Stringfellow] "Shut up!"

23:54:02    **Officer**:      "It's called resisting."

23:54:04    **Stringfellow**:  "Wait, what? Wh . . .?"

23:54:04    **Burnham**:     "Come on."

23:54:06    **Stringfellow**:  "Resisting?"

23:54:07    **Passerby**:    "Good luck!"

[The officers and Stringfellow again appeared behind the police unit on its rear-facing camera.]

23:54:12    **Stringfellow**:  "Tell me what happened? What happened between us having a conversation and now this is going on?"

23:54:14    **Tellis**:       "Oh my God, oh my God, what's gonna happen to my son, man?"

23:54:22    **Burnham**:     [to Stringfellow] "Lean up against the damn car."

[The video depicted Officer Burnham gripping Stringfellow's neck and forcing it down towards the trunk of the car.]

23:54:22    **Stringfellow**:  "I'm not doing any . . ."

[The video showed Burnham, with his arm wrapped around Stringfellow's neck, pulling his head down towards the trunk as he yelled in Stringfellow's ear.]

13

23:54:24        **Burnham**:        "Do you understand me?  I said lean up against the car!"

23:54:27        **Stringfellow**: [to Officer Burnham] "I'm not doing anything . . ."

23:54:28        **Burnham**:        [to Stringfellow] "Lean down!"

23:54:31        **Burnham**:        [to other officer] "Open the Door."

[Burnham pulled Stringfellow back from the trunk.]

23:54:34        **Stringfellow**: "Sir, what's going on?  I'm not resisting."

[sound of car door opening]

23:54:40        **Stringfellow**: "Sir, what's going on, man?"

23:54:43        **Stringfellow**: "Okay, I'm sitting down."

23:54:44        **Officer**:        "Get your feet in the car."

23:54:45        **Stringfellow**: "What's going on . . .  Sir, why?"

23:54:47        **Burnham**:        "Get your feet in the car, you're about to get tased."

23:54:53        **Officer**:        "Get your foot in the car!"

23:55:05        **Tellis**:        "Why you got to push me man?"

23:55:14        **Burnham**:        [to second officer] "I didn't see what happened . . .  With him, I have charges on him."

23:55:18        **Officer**:        [to Burnham] "He was in his face."

23:55:19        **Burnham**:        "Okay, we're taking them both."

[Tyler Ward arrived and starting talking to the officers.]

23:55:27        **Ward**:        "Let me tell you what happened . . . I was on the phone with my girlfriend.  And she was like, *can y'all, you know, stop acting childish*?  I'm like ma'am, did we do anything to you?  She was like, *y'all momma didn't teach you that way*.

[sound of car door opening]

14

23:55:42       **Officer**:       [screaming at Tellis] "Get out the car!"

[One of the officers removed Tellis from the adjacent vehicle, and pushed him against the trunk of the car that Stringfellow was in.]

23:55:45       **Tellis**:       "What did I do, man?"

23:55:48       **Officer**:       "Do NOT remove your handcuffs!"

23:55:50       **Tellis**:       "I was calling someone. I was calling my momma. I was calling my lawyer and everything."

23:55:58       [inaudible yelling]

23:56:00       [Officers appear to re-handcuff Tellis's hands behind his back.]

23:56:04       **Stringfellow**: "What the f___?!"

23:56:09       **Stringfellow**: "Oh my f___ God!"

23:56:15       **Ward**:       [still explaining what happened to the officers] "She's not being sweet. She's talking about our mommas. We didn't say nothing to you. Like . . . He's [Tellis] getting groceries for his son. He's getting his Enfamil. And she started talking to us . . . I'm like uhhhh. Why you talking to us like that? . . .  I'm not going to keep talking. I already know . . . I got a lawyer. I gotta stay cool . . . She called the police, real like . . . Get what you gotta do. 'Cause I seen y'all putting the law outside. I don't know what happened. I know this is what happened inside the store. But I know like, we didn't do nothing. Everything was verbally. You know. There was no harsh account. Like nothing harsh said to her like could manipulate her or hurt her in any kinda way. Everything . . . I don't know what happened when y'all went in the store . . . but, that's what happened when I was in the store. That's what happened when I was in the store.

23:57:19       **Officer**:       [to Ward] "You got your ID?"

23:57:20       **Ward**:       "Nah, I ain't got no ID."

23:57:21       **Officer**:       "Who was driving?"

23:57:23       **Officer**:       "What's your name?"

| | | |
|---|---|---|
| 23:57:24 | **Ward**: | "My name's Tyler Ward." |
| 23:57:26 | **Officer**: | "How do you spell that?" |
| 23:57:27 | **Ward**: | "T-Y-L-E-R . . . W-A-R-D" |
| 23:57:33 | **Officer**: | "When's your birth date?" |
| 23:57:35 | **Ward**: | "1_ 19_" |
| 23:57:38 | **Officer**: | " . . . see your hand [inaudible]" |
| 23:57:38 | **Ward**: | "I had to walk outside.  I couldn't deal with that." |
| 23:57:44 | **Officer**: | "What's your phone number, Tyler?" |
| 23:57:44 | **Ward**: | "318 ___ _____" |

23:58:01     [An officer shined a flashlight behind Stringfellow's back in the car.  The officer also reached in with his hand to check Stringfellow's handcuffs.]

23:58:00     **Stringfellow**: [to officer] "So, what happened, really? Where all this happened?" [inaudible]

23:58:02     **Ward**:     [to officer] "Can you tell me what happened?"

23:58:08     **Officer**:   [to Ward] "He's going to jail.  How old is he?"

23:58:10     **Ward**:     "What'd he do?"

23:58:11     **Officer**:   "How old is he?"

23:58:14     **Officer**:   "He's old enough.  He's over 21."

23:58:20     **Burnham?**:  [to Ward] "Hang on . . ."

23:58:22     **Stringfellow?**: "Please call my Mom, man. . . I'm going to jail for what?"

23:58:27     **Darden**:    [to Ward] "We tried to talk to them and ask them what happened.  He's drunk [pointing towards Stringfellow]; he smells like booze [gesturing offscreen, presumably towards Tellis].  I tried to get them to come outside and he [pointing towards Stringfellow] jumps in his face and he [gesturing offscreen, presumably towards

|          |                |                                                                         |
|----------|----------------|-------------------------------------------------------------------------|
|          |                | Tellis] starts fighting me."                                            |
| 23:58:48 | **Ward**:      | [to officers] "I understand where you're coming from."                  |
| 23:58:50 | **Officer**:   | [to other officers] "Let's get them to the station."                    |
| 23:58:53 | **Ward**:      | [to officer] "Alright, man."                                            |
| 23:58:55 | **Officer**:   | [to Ward] "Thank you"[10]                                               |

[Ward departed.  Officers Burnham and Davidson sat down in the squad car with Stringfellow. They departed for the detention center.]

|          |                  |                                                                                                                                                                                                                                                                                                                                      |
|----------|------------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| 23:59:01 | **Stringfellow**: | "Whyyy?"                                                                                                                                                                                                                                                                                                                             |
| 23:59:06 | **Stringfellow**: | "Excuse me sir, I just wanna know to what point did it happen to where . . ."                                                                                                                                                                                                                                                         |
| 23:59:14 | **Burnham**:     | "When y'all wouldn't shut up, and when you started getting up in my face."                                                                                                                                                                                                                                                            |
| 23:59:17 | **Stringfellow**: | "Sir, I never got in your face."                                                                                                                                                                                                                                                                                                      |
| 23:59:18 | **Burnham**:     | "You don't get up in an officer's face."                                                                                                                                                                                                                                                                                              |
| 23:59:20 | **Stringfellow**: | "It's on camera; it's on camera in Wal-Mart."                                                                                                                                                                                                                                                                                         |
| 23:59:23 | **Stringfellow**: | "I NEVER, I NEVER got in your face!"                                                                                                                                                                                                                                                                                                  |
| 23:59:29 | **Stringfellow**: | ". . . you're a grown man, I'm a grown man . . . I RESPECT you! Everything that I say CAN and will be used in a court of law  . . . So, please talk to ME!  To where I'm in handcuffs, right now . . . to where I'm in handcuffs right now, sir, please tell me this.  To what happened, in what degree did you have to take it to where you pulled a taser on me and I'm in handcuffs?  Tell me!" |
| 00:00:02 | **Stringfellow**: | "Oh ok, you don't wanna talk now, 'cause this can be used in a court of law.  You don't wanna talk now.  I can't believe this, bro. How did we come to get my man some food for his BABY?  It's a young lady at the counter – she's BEAUTIFUL." |

---

[10] Officer Davidson explained that, based on Ward's actions and demeanor, he exercised his discretion not to arrest Ward.  (Davidson Depo., pg. 39).

00:00:22        **Stringfellow**: "God know.  That's all I know . . . God know."

00:00:37        **Stringfellow**: "I can't BELIEVE this."

[cell phone ringing]

00:00:39        **Burnham**:        [apparently talking on the phone] "They appear to have been drinking and s__.  And uh, one of them started getting all crazy . . . and the other one jumped up in my face [inaudible] . . . Put one of them on the ground.  The other one . . . did alright.

00:01:45        **Burnham**:        Yeah, well I got . . . Slade has charges and I have charges.

00:01:52        **Stringfellow**: "Wal-Mart got it on camera."

00:01:59        **Darden**:        [over the radio] "51 to 53"

00:02:02        **Davidson?**:        "Go ahead."

00:02:05        **Darden**:        "We're going to go ahead and get them both with "PPB [?] appearing intoxicated, as well."

00:02:11        **Davidson?**:        "10-4" [inaudible]

00:02:16        **Darden**:        "Ahh, it don't matter. You can go ahead."

00:02:19        **Davidson**:        "10-4" [inaudible]

00:03:40        **Burnham**:        "Look, you're going to jail for disturbing the peace, appearing intoxicated . . . and for resisting an officer."

00:03:45        **Stringfellow**: "You say I'm going to jail?"

00:03:46        **Officer**:        "Yep."

00:03:50        **Stringfellow**: "For doing what?"

00:03:54        **Officer**:        [over the radio] "Bring me the intoxilizer."

00:04:16        [conversation over the radio concerning "some more mouth pieces"]

00:04:27        **Stringfellow**: " . . . alcohol, and I'm intoxicated?  Excuse me sir, you smell alcohol and I'm intoxicated? . . . [inaudible]"

| 00:05:03 | The police units arrived at the detention center. The officers exited the vehicle and escorted Stringfellow inside. |

00:05:33      **Officer**:      [to Stringfellow] [inaudible]

00:05:34      **Stringfellow**: [sounded like] "you're really a dumbass"

00:05:35      **Officer**:      "Thank you"

00:05:40      **Stringfellow**: "I don't understand . . . maybe you had a bad day today? But, it's okay . . . God got you, bro."

[The officers and Stringfellow entered the detention center through the sally port]

00:05:54      [The other squad car (presumably with Tellis) drove inside the sally port.]

00:06:23      [The audio became inaudible.]

On the evening of May 31/June 1, 2015, Sarah Love-Campbell, a Lincoln Parish Sheriff's deputy, was the booking officer at the Lincoln Parish Detention Center when Stringfellow and Tellis arrived. (Love-Campbell Affidavit, MSJ, Exh. R). She documented in the booking records that both Stringfellow and Tellis appeared to be under the influence of alcohol. *Id.* (LPDC Booking Records, pgs. 000368, 370, 377, & 379). In addition, Stringfellow exhibited slurred speech. *Id.* Tellis's booking record further reflects that two weeks earlier, he had been hospitalized or treated by a doctor for hernia. *Id.* The records indicate that both Stringfellow and Tellis were assigned "Detox" cells. *Id.*, LPDC pgs. 000372 & 000381.

The booking charges for Tellis included, disturbing the peace – simple drunk, in violation of "103 SD," La. R.S. 14:103A(3), and resisting an officer in violation of "108," La. R.S. 14:108. (LPDC pg. 000372; Def. MSJ, Exh. R). The booking charges for Stringfellow included, disturbing the peace – simple drunk, in violation of "103 SD," La. R.S. 14:103A(3), resisting an officer in violation of "108," La. R.S. 14:108, and possession of marijuana in violation of

19

"966E," La. R.S. 40:966E.  (LPDC pg. 000381; Def. MSJ, Exh. R).

On June 1, 2015, Officers Darden and Burnham each executed nearly identical sworn affidavits of probable cause for arrest without a warrant for Tellis and Stringfellow, respectively. (Aff.s of Prob. Cause; Def. MSJ, Exh. F).[11]  The narrative portion for each affidavit stated that,

> [o]n 5-31-15 officers responded to Walmart in reference to two black males harassing a female n the store.  Upon arrival, contact was made with the complainant and she advised three black males were making sexual remarks to her, telling her she was beautiful and that they could make her night.  The complainant advised she asked them to stop and they continued with other sexual remarks she could not remember.  Officers made contact with two of the males, identified as Nicholas Stringfellow and Julian Tellis.  Both appeared to be impaired with slurred speech, bloodshot eyes, unsure balance, and an odor associated with that of the consumption of alcoholic beverages.  Officers began to advise both Tellis and Stringfellow that they were harassing the female which both denied then they began to get upset and questioned officers' procedures.  Stringfellow then lurched toward Officer Burnham, getting close to Officer Burnham's face and raising in voice, appearing to be a threatening posture.  Officer Burnham immediately began to handcuff Stringfellow.  Once handcuffed, Stringfellow began to jerk away from Officer Burnham and refused to enter the patrol unit.
>
> At the same time when Stringfellow was being placed into handcuffs, Officer Darden attempted to escort Tellis outside of the store.  Tellis immediately shoved Officer Darden with his shoulder and jerked away from him.  Tellis was taken to the floor using hard empty hand control and placed in handcuffs.  While escorting Tellis to the patrol unit, Tellis continuously attempted to jerk away from Officer Darden and once inside the patrol unit placed his handcuffs in front of his body and had to be handcuffed again behind his back.

*Id.*[12]

---

[11]  Darden stated in his deposition that he completed the probable cause affidavit while still at the detention center.  (Darden Depo., pgs. 46-47; Pl. Opp., Exh. 4-1).  Burnham was in accord.  (Burnham Depo., pg. 51; Pl. Opp. Memo., Exh. 5-1).

[12]  Burnham's affidavit is virtually identical to Darden's, except it includes an additional sentence and charge relating to the discovery of a small amount of marijuana in Stringfellow's sock. *Id.*

The officers later completed incident detail reports that elaborated upon their probable cause affidavits.  (Incident Detail Reports; Def. MSJ, Exh. F, COR 000393, 000397).

The affidavits charged Tellis and Stringfellow with violations of City of Ruston ordinances for disturbing the peace (appearing intoxicated), 11:103; and resisting an officer (violence) 11:108; (plus, as to Stringfellow, an additional charge for simple possession of marijuana, 11:300). *Id*.[13]

Booking records confirm that Stringfellow and Tellis's personal items were returned to them at 3:41 a.m. and 3:46 a.m., respectively,[14] which *suggests* (but by no means establishes) that they were released around that time – i.e., within four hours after they were taken into custody.

On July 7, 2015, the City of Ruston filed bills of information against Stringfellow and Tellis on charges of resisting an officer (violence) in violation of Ruston Ordinance 11:108B(1)(b). (Bills of Information; Pl. Opp., Exh. 8). On December 17, 2015, Cottingham testified in the criminal proceedings against Stringfellow and Tellis. *City of Ruston v. Tellis*, No. S-22610, S-22611, *consolidated with*, *City of Ruston v. Stringfellow*, S-22605, S-22607 (Dec. 17, 2015 Ruston); Pl. Opp., Exh. 6. She said that neither Stringfellow nor Tellis said anything to her at the Wal-Mart store on the night in question. *Id*. She further testified that she did not smell any alcohol on either of them. *Id*.[15] On January 21, 2016, the prosecutor dismissed the charge

_____

[13] The officers stated that they could have charged Stringfellow and Tellis with more charges, e.g., simple assault of a police officer. (Burnham Depo., pgs. 66-76). However, it is department policy not to stack charges. *Id*.

[14] *Id*., LPDC pgs. 000385 & 000376.

[15] Defendants urge this court not to consider the transcripts from the December 17, 2015, hearing because they constitute hearsay, and were not presented to Cottingham during her deposition. (Defs.' Reply Memo., pg. 8). However, defense counsel had the opportunity to cross-examine Cottingham during her deposition. (Cottingham Depo., pgs. 101-102). Moreover, plaintiffs' counsel advised Cottingham that her testimony from the criminal trial differed from her testimony at her deposition. (Cottingham Depo., pg. 91). In any event, it is manifest that Stringfellow actually spoke to Cottingham prior to the officers' arrival because he admitted as much. (Fobbs Depo., pg. 141). Moreover, the audio and video evidence confirm that Cottingham pointed out Stringfellow as one of the three men harassing her. *See Scott v. Harris*,

against Stringfellow and "nolle prossed" the charge against Tellis.  (Pl. Opp., Exh. 7).

At her deposition, Cottingham reaffirmed that she did not smell any alcohol on Stringfellow or Tellis, despite standing five to six feet away from them.  (Cottingham Depo., pg. 83).  However, she reaffirmed that Stringfellow had harassed her verbally.  *Id.*, pgs. 101-102. Cottingham explained that the two individuals (i.e., Tellis and Stringfellow) who appeared in the register 6 overhead camera were the same persons that she had called the police about. (Cottingham Depo., pgs. 33, 56; Pl. Opp. Exh. 10).  She stated that she told the police about the sexual comments that the individuals had made to her.  *Id.*, pg. 53.  Cottingham added that Ward *and* Stringfellow were the ones doing the talking.  *Id.*, pg. 94.  She believed that Tellis had fallen in with a bad group of people.  *Id.*, pg. 72.

Cottingham explained that as the squad cars were driving away, the car that had the man in dreads (i.e. Tellis) stopped and the officer (likely Darden) asked her for her I.D.  (Cottingham Depo., pg. 62).  She advised the officer that the individual in his car (Tellis) did not say anything to her.  *Id.*  The officer replied that, "[w]ell it's not because of that.  It's something else."  *Id.*, pgs. 62, 72, 80-81, 86.

Shondra Fobbs was standing in the check out line at Wal-Mart behind Ward, Stringfellow, and Tellis on the night in question.  (Fobbs Depo., pgs. 44; Pl. Opp., Exh. 12).  She knew all three of the young men from her days as a substitute teacher at Grambling High School. *Id.*, pg. 26-27.  As Ms. Fobbs arrived at the checkout line, Tyler Ward was leaving.  *Id.*, pg. 55. Fobbs heard Stringfellow say, "[t]his woman is crazy."  *Id.*, pg. 56.  She also heard Cottingham

550 U.S. 372, 380, 127 S.Ct. 1769 (2007) (when testimony is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts for purposes of ruling on a motion for summary judgment.").

tell Ward that she had just called the police, and that they were on their way. *Id.*, pg. 57.  Fobbs

added that Cottingham said that the men were sexually harassing her. *Id.*, pg. 60.  She also

overheard Cottingham tell the cashier that Stringfellow (plus Ward) had said something to her.

*Id.*, pg. 66.  Stringfellow replied, "I gave you a compliment."  *Id.*, pg. 67.  Tellis told Cottingham,

"I didn't say anything to you."  *Id.*  Cottingham replied, "I know.  I'm not talking about you."  *Id.*

Ms. Fobbs did not smell any alcohol on Stringfellow or Tellis despite standing but an arm's

length away from them.  *Id.*, pgs. 78, 163.

<u>**Analysis**</u>

**I.    Federal Law Claims**

Section 1983 provides that any person who, under color of state law, deprives another of

"any rights, privileges or immunities secured by the Constitution and laws shall be liable to the

party injured in an action at law, suit in equity, or other proper proceeding for redress. . . ."

*Harrington v. Harris*, 118 F.3d 359, 365 (5th Cir. 1997) (citing 42 U.S.C. § 1983).  Section

1983, however, does not create any substantive rights; it simply provides a remedy for the rights

designated therein.  *Id.*  "Thus, an underlying constitutional or statutory violation is a predicate to

liability under § 1983."  *Id.*  (citation omitted).

"To state a claim under § 1983, a plaintiff must (1) allege a violation of rights secured by

the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was

committed by a person acting under color of state law."  *Leffall v. Dallas Independent School

District*, 28 F.3d 521, 525 (5th Cir. 1994).  The first inquiry is whether plaintiff has alleged a

violation of a constitutional right at all.  *Id.  Piotrowski v. City of Houston*, 51 F.3d 512, 515 (5th

Cir. 1995).

a)    Claims under the Fifth, Sixth, and Ninth Amendments to the U.S. Constitution

Plaintiffs asserted jurisdiction, *inter alia*, pursuant to the Fifth, Sixth, and Ninth Amendments to the U.S. Constitution. (Compl., ¶ 1.1). Aside from this initial invocation, however, plaintiffs never again mention these constitutional provisions. Indeed, the court discerns no actionable grounds under these amendments. For example, "[t]he Fifth Amendment applies only to violations of constitutional rights by the United States or a federal actor." *Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir.2000) (citation omitted). Here, however, there are no allegations or evidence that any defendant acted under the authority of the federal government.

Furthermore, while the Sixth Amendment provides the accused the right *inter alia* "to be informed of the nature and cause of the accusation" against him, plaintiffs have not set forth any facts to support a claim that they were materially harmed by any unarticulated violation of the Sixth Amendment. *See Burkett v. City of El Paso*, 513 F. Supp. 2d 800, 813–14 (W.D. Tex.2007).

Finally, plaintiffs are unable to assert a viable claim for relief under the Ninth Amendment. The Ninth Amendment provides that, "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. CONST. AMEND. IX. However, courts have recognized that the Ninth Amendment does not specify any rights of the people and is not a vehicle for bringing civil rights claims. *Mitchell v. Town of Lake Arthur*, No. 16-0064, 2016 WL 2726561, at *2 (W.D. La. May 9, 2016); *Ned v. Eunice Police Dep't*, No. 16-1035, 2017 WL 369128, at *1 (W.D. La. Jan. 23, 2017).

24

b)    <u>Official Capacity Claims against the Individual Defendants</u>

Plaintiffs sued defendants, Burnham, Darden, Davison, and Chief Rogers, in their individual *and* official capacities. (Compl., ¶¶ 2.4-2.7). It is manifest, however, that official capacity suits, "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105 (1985) (citing, *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035, n. 55 (1978)). Thus, "an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id*.

When, as in this case, the local government entity itself is a defendant (i.e., the City of Ruston) then official capacity claims against specific individuals employed by, or managers of, that entity are redundant and subject to dismissal. *Hicks v. Tarrant Cnty. Sheriff's Dep't*, 352 F. App'x 876, 877 (5th Cir. 2009) (citations omitted) (because local government entity was a named defendant, district court did not err in dismissing official capacity claims against its commissioners); *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268 (5th Cir.2015) (claim against mayor in his official capacity was treated as claim against the municipality itself); *see also Butler v. Craft*, No. 16-1158, 2017 WL 1366897, at *6 (W.D. La. Apr. 11, 2017) (collecting cases).

c)    <u>Fourth Amendment (via the Fourteenth Amendment) Individual Capacity Claims and Qualified Immunity</u>

When, as here, plaintiffs seek money damages from government officials in their individual capacities under § 1983, the affirmative defense of qualified immunity is available to protect defendants "from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 815 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982)).  The qualified immunity doctrine balances two often conflicting interests — "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id*.  As such, "[t]he protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id*. (citations omitted).  In effect, qualified immunity "gives ample room for mistaken judgments by protecting "all but the plainly incompetent or those who knowingly violate the law." *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir.2000) (citing *Malley v. Briggs,* 475 U.S. 335, 343, 341, 106 S.Ct. 1092 (1986) (internal quotation marks omitted).

Qualified immunity is nominally characterized as an affirmative defense.  However, once raised by defendants, it devolves upon plaintiffs to negate the defense by showing that the officials' conduct violated clearly established law.  *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir.2008) (citation omitted).  Plaintiffs' burden is two-pronged.  *Club Retro LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009) (quoted sources omitted).  First, plaintiffs must demonstrate that the defendant violated a constitutional right under current law.  *Id*.  "Second, [plaintiffs] must claim that the defendant[s'] actions were objectively unreasonable in light of the law that was clearly established at the time of the actions complained of."  *Id*.  (quoted source and internal quotation marks omitted).  The courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the

circumstances of the particular case at hand." *Collier v. Montgomery*, 569 F.3d 214, 217 (5ᵗʰ Cir. 2009) (citation omitted).

In the peculiar context of a motion for summary judgment, "once [the court has] determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record, the reasonableness of [a police officer's] actions . . . is a pure question of law." *Scott*, 550 U.S. at 397, 127 S.Ct. at 1776 n.8 (2007).   Consequently, the Fifth Circuit has recognized that,

> when facts are undisputed and no rational factfinder could conclude that the officer acted unreasonably, we can hold that an officer acted reasonably as a matter of law.  But when facts are disputed and significant factual gaps remain that require the court to draw several plaintiff-favorable inferences, our analysis is more tentative.  In these cases, we must consider what a factfinder could reasonably conclude in filling these gaps and then assume the conclusion most favorable to the plaintiff.

*Lytle v. Bexar Cty., Tex.*, 560 F.3d 404, 411–12 (5th Cir.2009) (internal citation omitted).

In other words, there is no constitutional violation if – even after crediting the version of facts most favorable to plaintiff – the officer's conduct was objectively reasonable.  *Id*.

In the case at bar, plaintiffs asserted claims for wrongful arrest and excessive force.  Also pertinent to the inquiry, however, is whether the officers unlawfully detained plaintiffs initially.  All of these rights are analyzed under the Fourth Amendment,[16] which protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. AMEND. IV.  Of course, the protections of the Fourth Amendment extend to the states pursuant to the Fourteenth Amendment.  *Dunaway v. New York*,  442 U.S.

---

[16]   *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871 (1989) ("*all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . .").

200, 207, 99 S.Ct. 2248, 2253-2254 (1979) (citation omitted).

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 127 S.Ct. 2400, 2405 (2007) (citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868 (1968) (internal quotation marks omitted).

Under *Terry v. Ohio*, a law enforcement officer may temporarily detain a person when the "officer has a reasonable, articulable suspicion that a person has committed or is about to commit a crime." *United States v. Chavez*, 281 F.3d 479, 485 (5th Cir. 2002) (citation omitted). Reasonable suspicion may be described as "'a particularized and objective basis' for suspecting the person stopped of criminal activity." *Id*. (citing *Ornelas v. United States*, 517 U.S. 690, 696, 116 S.Ct. 1657 (1996)). To satisfy the Fourth Amendment, the stopping or detaining officer must be able to "articulate more than an 'inchoate and unparticularized suspicion or hunch of criminal activity." *Id*. (citation and internal quotation marks omitted).

The Fourth Amendment requires but a "minimal level of objective justification for making the stop," and requires "a showing considerably less than preponderance of the evidence." *Id*. (citation omitted). The validity of the stop is determined under "the totality of the circumstances-the whole picture." *Id*. (citing *United States v. Sokolow*, 490 U.S. 1, 7-8, 109 S.Ct. 1581 (1989)). Therefore, in assessing the legality of a detention, "courts are first to evaluate whether the stop was lawful at the outset and second to determine whether the officers conducted the stop in a manner reasonably related in scope to the circumstances which justified the interference in the first place." *Brown v. Lynch*, 524 Fed. Appx. 69, 75 (5th Cir.2013)

28

(citation and internal quotation marks omitted).

Viewing the evidence in the light most favorable to plaintiffs, the officers had reasonable suspicion to detain Stringfellow and Tellis pursuant to Cottingham's complaint.[17]  It is uncontroverted that Cottingham called 9-1-1, and reported that three males were sexually harassing her.  The facts of this call were forwarded to the responding officers.  *See Evett v. DETNTFF*, 330 F.3d 681, 688 (5th Cir.2003) (probable cause may be supported by the collective knowledge of law enforcement personnel who communicate with each other prior to the arrest/detention).

Upon arriving at the scene, the officers encountered Cottingham who led the officers reasonably to believe that Stringfellow and Tellis were two of three males whom she had called about.  In fact, the MVR audio captured Stringfellow acknowledging that he spoke to Cottingham, albeit, according to him, only to tell her that she was beautiful.  When Tellis returned from the restroom, he took up position beside Stringfellow, thereby implicating himself as another member of the trio that Cottingham had called about.  Cottingham did not tell the officers – at that time – that Tellis was merely a silent participant in his friends' verbal harassment.

Furthermore, no reasonable jury could conclude that the officers' decision to separate Stringfellow and Tellis from Cottingham was not reasonably related in scope to the circumstances that led to the initial detention. The officers wanted to obtain Stringfellow and

---

[17]  As it turns out, they also had probable cause to arrest plaintiffs.  *See* discussion, *infra*.

Tellis's identities before proceeding further.[18]  To do so, they separated the two from the complainant.[19]  Of course, while in the process of trying to obtain Stringfellow and Tellis's identity information, the investigation escalated to an arrest.[20]

To be sure, probable cause is a defense to a § 1983 claim for false arrest.  *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir.1990) (citation omitted).  Further, even if there is no probable cause to arrest the plaintiff for the crime charged, proof of probable cause to arrest

---

[18]  In a similar case sparked by a telephone call reporting a potential roadside assault involving a man and young woman, the Supreme Court noted that,

> [o]btaining a suspect's name in the course of a *Terry* stop serves important government interests. Knowledge of identity may inform an officer that a suspect is wanted for another offense, or has a record of violence or mental disorder. On the other hand, knowing identity may help clear a suspect and allow the police to concentrate their efforts elsewhere. Identity may prove particularly important in cases such as this, where the police are investigating what appears to be a domestic assault. Officers called to investigate domestic disputes need to know whom they are dealing with in order to assess the situation, the threat to their own safety, and possible danger to the potential victim.

*Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 186, 124 S.Ct. 2451, 2458 (2004).

[19]  By detaining plaintiffs, at least initially for the purpose of requiring them to identify themselves, the officers performed a seizure subject to the requirements of the Fourth Amendment.  *Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 2640 (1979).

[20]  However,

> [t]here is no bright line point of distinction between an investigatory stop and an arrest; indeed, the endless variations in facts and circumstances preclude efforts to locate one.  An officer may use some degree of physical force to effect an investigatory stop, which force might, in some situations, include restraining the suspect with handcuffs.  But such force must be objectively reasonable under the circumstances, and although an officer may resort to physical restraint in special circumstances, doing so is not ordinarily proper without probable cause.

*Brown*, 524 Fed. Appx. at 75–76 (citations and internal quotation marks omitted).
Also, investigative detention may constitute a *de facto* arrest.  *United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993); *Freeman v. Gore*, 483 F.3d 404, 413 (5th Cir.2007) ("Police detention constitutes an arrest").

the plaintiff for a related offense also constitutes a defense.  *Id*. (citation omitted).  Indeed,  the officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause."  *Devenpeck v. Alford*, 543 U.S. 146, 152-154, 125 S.Ct. 588, 593-594 (2004).  The offense establishing probable cause need not even be "closely related" to, or based on the same conduct that motivated the arresting officer.  *Id*.

"Probable cause exists when the facts and circumstances within the arresting officer's personal knowledge, or of which he has reasonably trustworthy information, are sufficient to occasion a person of reasonable prudence to believe an offense has been committed."  *Evett*, 330 F.3d at 688 (citation omitted).  In addition, "[p]robable cause is determined on the basis of facts available to the officer at the time of the arrest, and an officer may be shielded from liability even if he reasonably but mistakenly conclude[s] that probable cause is present."  *Id*.  (citations and internal quotation marks omitted).  Thus, "an acquittal does not necessarily signal an absence of probable cause for an arrest, for the standards for a determination of probable cause and for a criminal conviction markedly differ."  *Brumfield v. Jones*, 849 F.2d 152, 155 (5th Cir.1988) (citation omitted).

The probable cause standard "applie[s] to all arrests, without the need to balance the interests and circumstances involved in particular situations."  *Atwater v. City of Lago Vista*, 532 U.S. 318, 354, 121 S.Ct. 1536, 1557 (2001) (citation and internal quotation marks omitted). Thus, once "an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."  *Id*.

In this case, defendants contend that, by the time they placed hands on Stringfellow and

Tellis, they had probable cause to arrest the individuals on multiple charges.  Initially, they

contend that they had probable cause to arrest plaintiffs for two separate violations of the

disturbing the peace statute:

> Disturbing the peace is the doing of any of the following in such manner as would foreseeably disturb or alarm the public:
>
> *        *        *
>
> (2) Addressing any offensive, derisive, or annoying words to any other person who is lawfully in any street, or other public place; or call him by any offensive or derisive name, or make any noise or exclamation in his presence and hearing with the intent to deride, offend, or annoy him, or to prevent him from pursuing his lawful business, occupation, or duty; or
>
> (3) Appearing in an intoxicated condition . . .

La. R. S. § 14:103(A)(2)-(3).

As already discussed, Cottingham called 9-1-1 and reported that three men were sexually

harassing her at Wal-Mart.  When the officers arrived on scene, Cottingham provided grounds

for the officers reasonably to believe that Stringfellow and Tellis were two of the three men

involved.  She described to the officers the nature of the unwanted advances made by the men.

She also advised 9-1-1 that she had asked the men to stop their unwanted solicitation and

commentary.

At no time prior to Stringfellow and Tellis's arrests, did Cottingham disclose to the

officers that the three men exhibited varying degrees of participation in the harassment.[21]  In sum,

the officers possessed information from a complainant indicating that Stringfellow and Tellis

---

[21] *See Canady v. Prator*, No. 13-0923, 2015 WL 507883, at *6 (W.D. La. Feb. 6, 2015) (complainant's after-the-fact averment that the arrestee-plaintiff was not screaming or disturbing the peace does not generate genuine dispute of material fact as to whether a reasonable officer had probable cause at the scene).

were two members of a trio who had addressed offensive or annoying words[22] to someone in a public place that foreseeably could disturb the public.[23]  A person of reasonable prudence could conclude that an offense had been committed.  *See Canady, supra.*

In addition, the officers had probable cause to arrest Stringfellow for the additional offense of appearing in an intoxicated condition such that he foreseeably could disturb or alarm the public.  The officers observed both Stringfellow and Tellis to exhibit symptoms and odors consistent with alcohol consumption.  While Cottingham and Fobbs denied smelling alcohol emanating from Stringfellow or Tellis, their testimony does not undermine the officers' observations as to Stringfellow because he confirmed in his deposition that he had been drinking that day.  (Stringfellow Depo., pg. 216).  Furthermore, the audio recording from the MVR establishes that Stringfellow's speech was slurred at times, disjointed, and less than pellucid.

As to Tellis, however, Cottingham and Fobbs' testimony *does* suffice to create a fact issue as to whether he was intoxicated.  In contrast to Stringfellow, there is no corroborating evidence to support the officers' observations.

The officers further contend that they had probable cause to arrest Stringfellow and Tellis

---

[22]  Intent to deride, offend, or annoy may be inferred.  *Canady, supra* (citation omitted).

[23]  The Louisiana Supreme Court has interpreted "in such a manner as would foreseeably disturb or alarm the public" as applying only to "conduct which is violent or boisterous in itself, or which is provocative in the sense that it induces a foreseeable physical disturbance." *Netherland v. Eubanks*, 302 Fed. Appx. 244, 247 (5th Cir.2008) (*State v. Jordan*, 369 So.2d 1347, 1350 (La.1979)).  The alleged propositioning in this case certainly would qualify as boisterous.  Alternatively, if the unwanted advances continued, it is foreseeable that they would provoke a physical reaction from the recipient, or even from the aggressor stemming from his spurned advances.

for resisting an officer.  The statute provides in pertinent part:

> A. Resisting an officer is the intentional interference with, opposition or resistance to, or obstruction of an individual acting in his official capacity and authorized by law to make a lawful arrest, lawful detention, or seizure of property or to serve any lawful process or court order when the offender knows or has reason to know that the person arresting, detaining, seizing property, or serving process is acting in his official capacity.
>
> B. (1) The phrase "obstruction of" as used herein shall, in addition to its common meaning, signification, and connotation mean the following:
>
>         *        *        *
>
> (b) Any violence toward or any resistance or opposition to the arresting officer after the arrested party is actually placed under arrest and before he is incarcerated in jail.
>
> (c) Refusal by the arrested or detained party to give his name and make his identity known to the arresting or detaining officer or providing false information regarding the identity of such party to the officer.

La. R.S. § 14:108(A) & (B)(1)(b)-(c).[24]

Here, the officers had lawfully detained Stringfellow and Tellis on suspicion of disturbing the peace.  The officers directed the men to step forward and accompany them.  However, Stringfellow and Tellis hesitated to do so, thus necessitating several loud commands to compel compliance.[25]

---

[24] In 2006, the legislature expanded the reach of the statute to include not only persons under arrest, but also persons lawfully detained.  *See* Acts 2006, No. 132, § 1 and *State v. Johnson*, 109 So.3d 407, 412 n.3 (La. App. 2d Cir. 2013).  Therefore, case law interpreting the prior version of the statute is inapposite.  *See e.g., Brumfield v. Jones*, 849 F.2d 152, 155 (5th Cir. 1988).

[25] The individuals' initial refusal to move constitutes intentional interference or obstruction of a law enforcement officer conducting investigative work at the scene of a crime in violation of Louisiana Revised Statute § 14:329.  This transgression provides the officers with additional probable cause to arrest Stringfellow and Tellis.  *See e.g., DeRamus v. City of Alexandria*, No. 14-03222, 2016 WL 285150, at *3 (W.D. La. Jan. 21, 2016).

After Stringfellow and Tellis reluctantly complied with the officers' order to follow them to the front of the store, the officers endeavored, with mixed success, to obtain identity information from both men. While Stringfellow eventually disclosed his personal information, Tellis proved more evasive. Instead of assisting the investigation, Tellis advised the officers that they were doing things wrong. Stringfellow and Tellis emphasized to the officers that, in contrast to the officers' impressions, the two men were aware of proper police procedures. In so doing, Stringfellow raised his voice and took a long step that brought him in close proximity to the officers. Tellis simultaneously took a small step towards another officer.

Under the totality of these circumstances, a person of reasonable prudence could conclude that Stringfellow and Tellis's actions intentionally interfered with, opposed, or resisted their lawful detention. These same movements by Stringfellow and Tellis towards the officers reasonably could be interpreted by the officers as "threatening force or violence" by someone detained,[26] or alternatively, assault, in violation of Louisiana Revised Statutes §§ 14:108.2 and 36, respectively.[27]

In sum, the defendant-officers had probable cause to arrest Stringfellow and Tellis for myriad offenses at the time that they laid hands on them. Even if the officers were mistaken in their probable cause assessment, their belief was reasonable. Therefore, the officers are entitled

---

[26]  Stringfellow and Tellis received notice that they were detained by virtue of the officers' insistent commands for the men to come with them. *See* La. R.S. § 14:108.2(A)(1).

[27]  Defendants further contend that the officers had probable cause to arrest Tellis for battery and Stringfellow for possession of marijuana. However, the video confirms that Tellis bumped Officer Darden's shoulder after Darden grabbed Tellis's other arm, thus forcing his shoulder to turn into Darden's. Consequently, it does not appear that Tellis intentionally used force upon Darden. Moreover, the officers did not have probable cause to arrest Stringfellow for marijuana possession because they were unaware of the contraband at the time of arrest.

to qualified immunity from plaintiffs' claim for wrongful arrest as a matter of law.  *See Lock v. Torres*, ___ Fed. Appx.___,  2017 WL 2643957, at *3 (5th Cir. June 19, 2017) (officer is entitled to qualified immunity even if she "reasonably but mistakenly conclude[d] that probable cause [was] present").[28]

Having determined that the officers not only had reasonable suspicion to detain plaintiffs, but also probable cause to arrest them, the court must consider plaintiffs' claim for excessive force.[29]  By nature, excessive force claims are fact-intensive and dependent on the circumstances of each case.  *Hanks v. Rogers*, 853 F.3d 738, 745 (5th Cir.2017) (citations omitted).  Factors that the court should consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id*.  (citations and internal quotation marks omitted). The court must analyze the claim from the perspective of a reasonable officer on the scene.  *Id*. (citation omitted).  Thus, the "inquiry is whether the officer's actions were objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation."  *Id*. (citations and internal quotation marks omitted).

Applying the foregoing considerations here, the court initially finds that the officers, and Officer Burnham in particular, reasonably opted to handcuff Stringfellow in response to

---

[28]  The court need not reach the second prong of the qualified immunity analysis as to plaintiffs' claim for wrongful arrest.  Nonetheless, it is clearly established that a person has the right to be free from arrest without probable cause.  *Lock, supra* (citation omitted).

[29]  Plaintiffs' excessive force claim is separate and distinct from their unlawful arrest claim.  *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir.2007).  The court must analyze the excessive force claim without regard to whether the arrest itself was justified.  *Id*. (citations omitted).

36

Stringfellow's escalating tone and aggressive move towards the officers.  Although the crime that the officers were investigating initially was not that severe, the encounter escalated pursuant to Stringfellow's subsequent conduct.  Burnham also had probable cause at that time to arrest Stringfellow.  *See* discussion, *supra*.

The court viewed the video depicting Burnham's forced-march of Stringfellow to the car, and his efforts to compel Stringfellow to lean over the trunk.[30]  It is apparent, however, that Stringfellow resisted Burnham's efforts such that Burnham was unable to thoroughly pat him down.  In fact, the marijuana secreted in Stringfellow's sock was not uncovered until he was booked into the detention center.  Burnham also did not gratuitously strike or purposefully injure Stringfellow without cause.  (Stringfellow Depo., pgs. 123-124).  Whilst Burnham apparently threatened Stringfellow with a taser in an effort to coax Stringfellow into placing his feet inside the vehicle, the compliance technique achieved its goal without the need to make good on the threat.

Furthermore, at best, Stringfellow has asserted no more than fleeting injury to his wrist from the handcuffs and rough handling by the officer.  However, the Fifth Circuit has held that "minor, incidental injuries that occur in connection with the use of handcuffs to effectuate an arrest do not give rise to a constitutional claim for excessive force."  *Freeman v. Gore*, 483 F.3d 404, 417 (5th Cir.2007) (citations omitted).  The same result obtains as to any claim for rough handling.

As for Tellis, Officer Darden was confronted with two increasingly agitated suspects who

---

[30]  In Louisiana, an individual "has a time-honored right to resist an illegal arrest." *Brown*, 524 Fed. Appx. at *4 (citations omitted).  Here, however, the officers had probable cause to arrest both individuals.

made simultaneous moves towards the officers.  Darden initially grabbed Tellis's arm and tried

to gain compliance.  He then attempted to walk Tellis out the door, but both plaintiffs admitted

that Tellis tensed up and braced himself against further movement.  (Stringfellow Depo., pg. 117;

Tellis Depo., pgs. 110-111).  In a controlled move, Darden took Tellis to the ground where Tellis

continued to wiggle about.  Officer Davidson held Tellis's legs as Darden used his knee to pin

Tellis down while he handcuffed him.  Darden then roughly jerked Tellis up, forced-marched

him to the car, and placed him inside.  Darden later had to remove Tellis and re-handcuff his

hands behind his back after Tellis moved his hands to the front of his body.

Under these circumstances, it was objectively reasonable for Darden to restrain Tellis

once he and Stringfellow moved towards the officers (i.e., once they posed an immediate threat).

Moreover, Tellis's refusal to be escorted outside (i.e., actively resisting arrest), reasonably

compelled Darden to take him to the ground to handcuff him, with Davidson's assistance.  *See*

*Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013) (suspect's attempt to shut the door on

the officers reasonably could be viewed as resisting arrest which provided support for the

officers' decision to tackle the suspect while he remained in sight, especially where a reasonable

officer could consider that tackling a suspect was unlikely to cause serious injury); *Poole v. City*

*of Shreveport*, 691 F.3d 624, 629 (5th Cir.2012) (plaintiff ignored repeated commands to turn

around and give up his arm, thus necessitating taser deployment and take down after plaintiff

kicked and screamed); *see also Poole v. Russell*, No. 14-0611, 2016 WL 6082041, at *6 (W.D.

La. Oct. 18, 2016) (placing a knee on plaintiff's back while another officer held him down until

handcuffs could be secured was objectively reasonable).

In *Collier v. Montgomery*, an officer stopped the plaintiff motorist for a seatbelt

infraction. *Collier v. Montgomery*, 569 F.3d 214, 218 (5th Cir.2009). When the plaintiff attempted to grab the officer's pen, the officer advised him that he was under arrest and reached for his wrist. *Id*. The plaintiff pulled away, and a struggle ensued. *Id*. The officer pushed the plaintiff onto the hood of the car and forced his arm behind his back, eventually obtaining compliance. *Id*. Plaintiff suffered abdominal bruising, other bruises, plus chest pain stemming from the encounter. *Id*. However, the court concluded that given plaintiff's physical resistance, the use of force was reasonable under the circumstances. *Id*.

The foregoing authority impels the same result here. Although Tellis alleged in his complaint that he suffered a hernia from the encounter, the uncontroverted summary judgment evidence establishes that his hernia was a preexisting condition. In fact, the only *evidence* of injury suffered by Tellis uncovered by the court was in Ms. Fobbs' deposition where she stated that she had observed bruising around Tellis's torso. However, the use of force remained proportionate and reasonable, give Tellis's non-compliance. *See Collier, supra*.

In his report, defendants' expert, George J. Armbruster, explained that Tellis, by moving his handcuffed hands from behind his back to the front of his body, made it possible to use his hands offensively. (Defs. MSJ, Exh. G).[31] This development presented a safety risk, thereby requiring Darden to extract Tellis from the car to re-cuff his hands behind his back.

In sum, even after crediting the version of facts most favorable to plaintiff, no reasonable

---

[31] Plaintiffs objected to the court's consideration of defendants' expert report. However, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed.R.Evid. 704(a). Nonetheless, an expert is not permitted to offer legal conclusions. *McBroom v. Payne*, 478 Fed. Appx. 196, 200 (5th Cir.2012) (citation omitted). Whether an officer's actions were reasonable constitutes a legal conclusion. *Id*. Accordingly, the court will not consider Armbruster's report insofar as it addresses legal conclusions.

juror could conclude that the officers' use of force was not objectively reasonable.[32]  Moreover, even if the use of force in this case *were* unreasonable, plaintiffs have not shown that it was clearly established in May/June 2015 that a reasonable officer would have known that the level of force used under the circumstances was excessive.  *See Hogan, supra* (citations omitted).  "While the right to be free from excessive force is clearly established in a general sense, the right to be free from the degree of force used in a given situation may not have been clear to a reasonable officer at the scene.  *Hogan*, 722 F.3d at 735 (citation omitted).

A law is clearly established when there exists "controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity."  *Id*.  Although a case directly on point is not required, "existing precedent must have placed the statutory or constitutional question *beyond debate.*"  *Id*. (citations and internal quotation marks omitted).  Thus, the question becomes whether the right is "sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right."  *Id*. (citations and internal quotation marks omitted).

Here, plaintiffs have not identified controlling authority that satisfies the foregoing criteria.[33]  At minimum, plaintiffs have not shown that every reasonable official would have

---

[32]  The court acknowledges that Officer Darden's initial interaction with Stringfellow and Tellis appeared to be unprofessional.  Moreover, his tone and overbearing conduct likely exacerbated the encounter and fueled plaintiffs' resistance to the investigation.  If all parties had maintained their composure, it is conceivable that the officers could have exercised their discretion to issue a citation or even released plaintiffs with a warning after completing the investigation.  *Compare* Tyler Ward's interaction with Officer Davidson.  In the end, while Darden's conduct was distasteful and intemperate, it fell short of the threshold required to support constitutional redress.

[33]  To be sure, there is recent authority confirming that of February 2013: clearly established law demonstrated that an officer violates the Fourth

known that the conduct at issue in this case violated the Fourth Amendment. Accordingly, plaintiffs have failed to overcome defendants' qualified immunity defense.

d)    First Amendment/Retaliatory Arrest Claim against the Individual Defendants

In their brief, plaintiffs argued that they were engaged in protected speech when they questioned the officers' procedures. The First Amendment "prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) (internal citations omitted). To prevail on a First Amendment retaliation claim plaintiffs must show that

> (1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct.

*Id*. (citations omitted).

Nevertheless, the Supreme Court has never recognized a First Amendment right to be free from a retaliatory arrest that is supported by probable cause. *Reichle v. Howards*, 566 U.S. 658, 132 S.Ct. 2088, 2093 (2012).[34] Here, plaintiffs' arrest was supported by probable cause. *See* discussion, *supra*. As the Fifth Circuit explained,

_____

> Amendment if he abruptly resorts to overwhelming physical force rather than continuing verbal negotiations with an individual who poses no immediate threat or flight risk, who engages in, at most, passive resistance, and whom the officer stopped for a minor traffic violation.

*Hanks*, 853 F.3d at 747.

However, the circumstances of this case are materially distinct. Tellis physically impeded Darden's efforts to escort him outside. Moreover, the officers did not strike either plaintiff.

[34] Plaintiffs have not shown any subsequent change in the law.

> when a person's conduct gives an officer probable cause to believe that she is
> guilty of a crime, that person does not taint a proper arrest by contemporaneously
> shouting "police officers are corrupt." Probable cause is an objective standard. If
> it exists, any argument that the arrestee's speech as opposed to her criminal
> conduct was the motivation for her arrest must fail, no matter how clearly that
> speech may be protected by the First Amendment. Of course, this is nothing more
> than a recognition that the Fourth Amendment's concern with reasonableness
> allows certain actions to be taken in certain circumstances, whatever the
> subjective intent of the officer.

*Mesa v. Prejean*, 543 F.3d 264, 273 (5th Cir.2008).

Accordingly, qualified immunity shields defendants from plaintiffs' retaliatory arrest claim under

the First Amendment.

e)    § 1983 Claim Against Chief Steve Rogers

Plaintiffs alleged in their complaint that Chief Rogers was liable for his failure to

supervise and/or discipline Officers Darden, Burnham, and Davidson. However, supervisory

officials are not liable under § 1983 for the actions of subordinates under any theory of vicarious

liability. *Turner v. Lieutenant Driver*, 848 F.3d 678, 695 (5th Cir.2017) (citation omitted).

Rather, to be liable under § 1983, the supervisor

> must have been personally involved in the alleged constitutional deprivation or
> have engaged in wrongful conduct that is causally connected to the constitutional
> violation. Personal involvement of supervising personnel generally includes
> giving a "command, signal, or any other form of direction to the officers that
> prompted" the detention or arrest.

*Id*.

Plaintiffs did not allege or adduce any evidence to show that Chief Rogers was personally

involved in any alleged constitutional violation.

Nevertheless, a supervisor not personally involved in the acts that purportedly deprived

plaintiffs of their constitutional rights is subject to liability under § 1983 if: "1) the [supervisor]

failed to train or supervise the officers involved; 2) there is a causal connection between the

alleged failure to supervise or train and the alleged violation of the plaintiff's rights; and 3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Thompson v. Upshur Cty., TX*, 245 F.3d 447, 459 (5th Cir.2001) (citations omitted). However, proof of more than one instance of lack of training or supervision resulting in a deprivation of constitutional rights is required before it may arise to the level of deliberate indifference. *Id*.; *see also Brown, supra*.

Plaintiffs have not made the requisite showing in this case. In any event, supervisors cannot be held liable for alleged constitutional violations by their subordinates, when, as here, plaintiffs failed to establish any constitutional transgressions by the subordinates. *Estate of Pollard v. Hood Cty., Tex.*, 579 Fed. Appx. 260, 266 (5th Cir.2014) (citations omitted).

f)    § 1983 Claim Against the City of Ruston

A local government entity or municipality is not subject to liability under § 1983 by virtue of the doctrine of respondeat superior. *O'Quinn v. Manuel*, 773 F.2d 605, 608 (5th Cir.1985). Instead, to impose § 1983 liability against a government entity for the misconduct of one of its employees or officers, plaintiffs must demonstrate that the constitutional deprivation was caused by a policy or custom of the entity. *Kohler v. Englade*, 470 F.3d 1104, 1115 (5th Cir. 2006) (citing *Monell v. New York City Dept. of Soc. Serv.*, 436 U.S. 658, 690-691, 98 S.Ct. 2018, 2036 (1978)). Specifically, a plaintiff must identify (a) a policymaker, (b) an official policy or custom or widespread practice, and (c) a violation of constitutional rights whose "moving force" is the policy or custom. *Monell*, 436 U.S. at 694.[35] "In a Section 1983 case, the burden of proving the

---

[35] For purposes of *Monell* liability, "[t]he final policymaker is the official or body upon whom state or local law has conferred the power to adopt rules governing the conduct of the entity's employees; merely granting an employee discretionary authority does not make the

existence of an unconstitutional municipal policy or established custom rests upon the plaintiff."

*McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989).[36]

Stringfellow and Tellis did not adduce evidence to meet the requirements for a *Monell* claim against the city.  Moreover, plaintiffs have not established an underlying constitutional violation by the individual defendants.  *A fortiori*, they have not identified a precipitating unconstitutional custom or policy enacted by the government entity.  *See Bustos v. Martini Club Inc.*, 599 F.3d 458, 467 (5th Cir. 2010) (because the officers did not violate plaintiff's constitutional rights, neither did the city).

## II.   State Law Claims

Plaintiffs asserted state law claims for excessive force, unlawful arrest, failure to train, negligent hiring, and respondeat superior.  In support of their claims, they invoked, *inter alia*, Article I, § 5 of the Louisiana Constitution and Louisiana Civil Code Article 2315.[37]

The Fifth Circuit has recognized that Louisiana's excessive force tort mirrors its federal

---

employee a final policymaker."  *Lee v. Morial*, No. 99-2952, 2000 WL 726882, at *2 (E.D. La. June 2, 2000).

[36]  Insofar as plaintiffs fault the city for failure to discipline the officers, a theory of ratification is limited to "extreme factual situations."  *Quinn v. Guerrero*, ____ F.3d ____, 2017 WL 2951586 (5th Cir. July 10, 2017) (citation omitted).  "[I]t is nearly impossible to impute lax disciplinary policy to the City without showing a pattern of abuses that transcends the error made in a single case."  *Id.*  (citation omitted).  Plaintiffs did not make that showing here.

[37]  Also, Louisiana Code of Criminal Procedure Article 220 provides that "[a] person shall submit peaceably to a lawful arrest. The person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained."  La.Code Cr.P. Art. 220.  However, if an officer uses unreasonable or excessive force, the officer and his or her employer are liable for any resulting injuries.  *Kyle v. City of New Orleans*, 353 So.2d 969, 972 (La.1977) (citations omitted).

constitutional counterpart. *Deville v. Marcantel*, 567 F.3d 156, 172–73 (5th Cir.2009).[38] Furthermore, "Louisiana applies qualified immunity principles to state constitutional law claims based on '[t]he same factors that compelled the United States Supreme Court to recognize a qualified good faith immunity for state officers under § 1983.'" *Roberts v. City of Shreveport*, 397 F.3d 287, 296 (5th Cir.2005) (*citing Moresi v. Dep't of Wildlife and Fisheries,* 567 So.2d 1081, 1093 (La.1990)). Because plaintiffs' excessive force claims under the Louisiana Constitution and Louisiana Civil Code parallel their § 1983 allegations, the court's resolution of plaintiffs' § 1983 claims necessitates the same disposition as to their state law claims. *Roberts, supra*; *DeVille, supra*; *Thomas, supra*.

Under Louisiana law, "[f]alse arrest and imprisonment occur when one arrests and restrains another against his will without a warrant or other statutory authority." *Deville*, 567 F.3d at 172 (citation omitted). An arrest is unlawful and actionable when the arresting officer lacks probable cause for the arrest. *Thomas, supra* (citation omitted). Here, the court has determined that the officers had probable cause to arrest plaintiffs, which undermines any basis for a false arrest claim under state law.

Insofar as plaintiffs advanced a claim against the city and Chief Rogers for negligent hiring, they must satisfy the five elements for a negligence claim under Louisiana law:

> (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the

---

[38] Article I § 5 of the Louisiana Constitution protects against unreasonable searches and seizures and, therefore, is analogous to the federal Fourth Amendment. *Thomas v. Town of Jonesville*, No. 11-048, 2013 WL 265235, at *6 (W.D. La. Jan. 23, 2013), *affirmed*, 539 Fed. Appx. 645 (5th Cir.2013).

defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element).

*Roberts v. Benoit*, 605 So.2d 1032, 1051 (La.1991), on reh'g (May 28, 1992).

Apparently in an effort to show that the city and Chief Rogers breached a duty to hire competent officers, plaintiffs point to other § 1983 cases filed against Slade Darden in this district. *See Jakob v. Darden*, No. 15-0085 (W.D. La.) and *Antley v. Darden*, No. 14-3307 (W.D. La.). Although the plaintiffs in *Jacob* and *Antley* included allegations of excessive force committed by Darden, the allegations have not been substantiated. The *Jacob* suit settled prior to trial. *Jacob, supra*. Moreover, the *Antley* case has yet to go to trial. In the absence of any findings that Darden violated any civil rights in those cases, they do not establish that the city and Chief Rogers breached any duty owed to plaintiffs.

Moreover, even if plaintiffs had shown that the city's hiring practices breached a duty owed to plaintiffs, any such breach was not a cause-in-fact of plaintiffs' injuries, where, as here, the court has determined that the officers' actions were objectively reasonable. *See Thomas, supra* (plaintiff cannot show causation between alleged breach and harm suffered where plaintiff cannot establish a constitutional violation by the officer).[39]

---

[39] Relatedly, under Louisiana law, cities do not enjoy special protection from vicarious liability for their employee-officers' tortious conduct. *DeVille, supra*. In this case, however, there is no liability to impute to the city because the court found no actionable transgressions by the officers. *See Poole v. Russell*, No. 14-0611, 2016 WL 6082041, at *7–8 (W.D. La. Oct. 18, 2016).

Finally, in their complaint, plaintiffs invoked Article I, Sections 2,[40] 3,[41] 4,[42] and 13[43] of the Louisiana Constitution.  (Compl., ¶ 1.1).  However, these constitutional clauses are "substantially equivalent" to their federal counterparts, and thus the same analysis applies to both.  *Powers v. United States*, 783 F.3d 570, 577 (5th Cir.2015) (citations omitted); *see also Miller v. Summit Health & Rehab Servs., Inc.*, No 16-1066, 2017 WL 2625123, at *6 (W.D. La. June 16, 2017) (citations omitted).  The court's disposition of any claims under the parallel provisions of the federal constitution condemns plaintiffs' bare invocation of these state law clauses to the same fate.  Moreover, plaintiffs did not advance any argument related to these state constitutional provisions.

## Conclusion

For the foregoing reasons, the court finds that there is no genuine dispute as to any material fact, and that movants are entitled to judgment as a matter of law.  Fed.R.Civ.P. 56.  Therefore,

---

[40] "No person shall be deprived of life, liberty, or property, except by due process of law."  La. Const. Art. I, § 2.

[41] "No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations . . ."  La. Const. Art. I, § 3.

[42] "Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property . . ."  La. Const. Art. I, § 4.

[43] " When any person has been arrested or detained in connection with the investigation or commission of any offense, he shall be advised fully of the reason for his arrest or detention, his right to remain silent, his right against self incrimination, his right to the assistance of counsel and, if indigent, his right to court appointed counsel . . ."  La. Const. Art. I, § 13.

IT IS ORDERED that the motion for summary judgment [doc. # 49] filed by defendants City of Ruston, Officer Jason Burnham, Officer Slade Darden, Officer Tyler Davidson, and Chief Steve Rogers is hereby GRANTED.  Judgment shall issue accordingly.

IT IS FURTHER ORDERED that defendants' motion to compel discovery responses and associated request for fees [doc. # 28] is DENIED, as moot.

In Chambers, at Monroe, Louisiana, this 26th day of July 2017.

KAREN L. HAYES
UNITED STATES MAGISTRATE JUDGE

48